UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | |
|---|---|
| -v.- | 19 Cr. 465-1 (KPF) |
| SALVATORE ARENA, | **ORDER** |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

  Defendant Salvatore Arena, who is currently incarcerated at the Federal Prison Camp in Lewisburg, Pennsylvania ("FPC Lewisburg"), has applied for compassionate release in the form of resentencing to time served, pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. #26, 31). In brief, Mr. Arena contends that he is at an increased risk of contracting, or of having a greater reaction to infection from, the COVID-19 virus because of pre-existing medical conditions. The Government opposes Mr. Arena's motion. (Dkt. #30). As set forth in the remainder of this Order, the Court denies Mr. Arena's motion for compassionate release.

## BACKGROUND

  On March 11, 2019, Mr. Arena was charged in a criminal complaint with mail fraud, money laundering, and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1956(a), 1343, and 2. (Dkt. #1). On June 21, 2019, a three-count felony information was filed charging Mr. Arena with the same three offenses. (Dkt. #10-11). The Final Presentence Investigation Report ("PSR" (Dkt. #32)), contains a detailed explication of the offense conduct

(*id.* at ¶¶ 10-33), and this conduct is accurately summarized in the Government's opposition:

> [The] charges stemmed from a scheme whereby Arena exploited his position as a tax accountant to steal funds from his clients. (*See* ECF Nos. 1, 21.)[1] Specifically, for almost two decades, Arena worked for an accounting firm in Manhattan that provided tax and other services. While working for that firm, Arena helped to prepare tax returns and facilitate tax payments for the firm's clients, and he solicited and promised to perform similar services for his own clients. In truth, however, Arena was stealing many clients' money.
>
> Arena stole funds from clients in two primary ways. First, he sent tax payments he solicited from clients to tax authorities, but he included instructions to credit those payments to *him* rather than his clients — resulting in apparent overpayments by Arena that eventually caused tax authorities to issue Arena unearned refund checks. Second, Arena directed clients to make payments to two New York shell companies he controlled, and then took those funds for himself. Overall, Arena's fraud appears to have impacted more than 170 victims and caused over $780,000 in financial losses.

(Dkt. #30 at 1 (emphasis in original)).

On August 23, 2019, Mr. Arena entered a plea of guilty to all three counts. (PSR ¶ 7; Dkt. #18 (plea transcript)). The plea was entered pursuant to a written plea agreement with the Government in which, among other things, the parties stipulated that the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") was 51 to 63 months' imprisonment. Sentencing took place on December 13, 2019. (Dkt. #22 (order

---

[1] The Court understands from the sentencing proceeding that Mr. Arena was a tax preparer but not an accountant.

of restitution), 23 (judgment)). During the sentencing proceeding, the Court heard from several victims of Mr. Arena's fraudulent scheme. Ultimately, the Court sentenced Mr. Arena principally to a term of 42 months' imprisonment, citing the length and breadth of his criminal conduct:

> I want to make clear that, by any metric, what happened in this case was egregious. It went on for a period of years. There were more than 170 victims. There were hundreds of thousands of dollars lost. And I do appreciate that Mr. Arena has begun to accept responsibility in this matter and I appreciate that he has. There are certain, though, of his explanations, that I do not accept fully. I do, or at least I may accept that he may not have been completely ready for the job he obtained in 1998, but seeing as the fraud in this case began in 2014, that's not a wholly satisfying explanation. I am not, at this point, willing to accept that the B figure, whom I have heard referenced this afternoon, she may have been the architect but not — I don't know that she was a complete Svengali. I do believe or I do note that it is Mr. Arena who had the personal contacts with many of the victims. Also, it was discussed that she had leverage over him but the leverage that was mentioned was the fact that she could have fired him. He could have left. And I don't think, and I am not accepting an explanation or a suggestion that somehow the sophistication of some of the victims matters because one can be very sophisticated in other aspects of their lives such as legal training and not understand the niceties of taxation law, particularly when some of the money is being sent to other corporations.
>
> So, I do accept that there is a degree to which Mr. Arena has accepted responsibility. … I do think that some of the discussions and some of the arguments made to me today overlook how deeply and intimately involved he was with the fraud and how much this really was something that he did and not something that he was forced to do. So, I am varying downwards slightly to account for Mr. Arena's medical issues…, but it is a modest downward variance.

3

(Transcript of Sentencing of December 13, 2019, at 46-47).

Mr. Arena self-surrendered to FPC Lewisburg on March 20, 2020. (Dkt. #26 at 2). Just over two months later, Mr. Arena filed a *pro se* application seeking "grant appropriate relief that it deems fair and just and protective of all involved" (*id.* at 10), which the Court understands to include a sentence reduction to time served and/or transfer to home confinement. (*See also* Dkt. #31 at 2 ("Accordingly, Arena respectfully request this Court reject the government's position and grant him compassionate release or provide any form of relief the court deems fair and just under these 'extraordinary and compelling circumstances.'")). In support, Mr. Arena cites a preexisting heart condition that resulted in a hemorrhagic stroke in 2014; high blood pressure; an enlarged heart; and acute liver disease. (Dkt. #26 at 2; Dkt. #31 at 1-2; *see also* PSR ¶¶ 70-75 (discussion of medical conditions, including high blood pressure, a hemorrhagic stroke, and alcohol-induced liver issues)). The Government filed an opposition letter brief on June 15, 2020. (Dkt. #30). Mr. Arena then filed a counseled reply on June 22, 2020. (Dkt. #31). The Court has also had the opportunity to review Mr. Arena's medical records, which were produced in response to a request of the Bureau of Prisons (the "BOP").

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the BOP, or upon motion of the defendant. A defendant may move under § 3582(c)(1)(A) only after the

defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). In making this determination, the court must consider the "the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable." *Id.* § 3582(c)(1)(A). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

Congress has delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The Sentencing Commission has determined that a defendant's circumstances meet this standard, *inter alia*, when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) &

5

Application Note 1(A), (D).  Following the passage of the First Step Act, courts may independently determine whether such "other reasons" are present in a given case, without deference to the determination made by the BOP.  *See United States* v. *Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).  In addition, the Sentencing Commission counsels that a court should reduce a defendant's sentence only after determining that "[t]he defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).

## DISCUSSION

Mr. Arena's motion is properly before the Court because the Bureau of Prisons ("BOP") denied his compassionate release request on May 20, 2020. (Dkt. #26 at 6).  The issue at hand is whether Mr. Arena has identified "extraordinary and compelling reasons" warranting his release.  The Court finds that he has not.

To begin, Mr. Arena argues that the conditions of his incarceration at FPC Lewisburg place him at a higher risk of contracting, or of having a greater reaction to infection from, the COVID-19 virus because of the nature of his confinement at the facility, his existing medical conditions, and the claimed inability of prison staff to handle the outbreak.  The Court recognizes, as do the parties, that sister courts in this District have granted, and denied, compassionate release motions based on the existence of the COVID-19 pandemic and the risks of its transmission at prisons.  (*See, e.g.*, Dkt. #26 at 7-10 (defense listing of cases granting compassionate release to inmates); Dkt.

6

#30 at 6-7 (Government distinguishing of cases cited by Mr. Arena)). This Court aligns itself with those courts that have found "that the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or *serious underlying health conditions* that place a defendant at greater risk of negative complications from the disease." *United States* v. *Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1-2 (S.D.N.Y. May 14, 2020) (emphasis added) (collecting cases); *see also United States* v. *Brady*, No. 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020) ("Instead, compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry, made in the 'unique circumstances' and 'context' of each individual defendant. In practice, courts in this district have considered the age of the prisoner; the severity and documented history of the defendant's health conditions, as well as the defendant's history of managing those conditions in prison; the proliferation and status of infections in the prison facility; the proportion of the term of incarceration that has been served by the prisoner; and the sentencing factors in 18 U.S.C. § 3553(a), with particular emphasis on the seriousness of the offense, the deterrent effect of the punishment, and the need to protect the public." (internal citations omitted)).

Mr. Arena has not demonstrated the existence of extraordinary and compelling circumstances in his case. Mr. Arena's medical records reflect a detailed intake interview at which he was able to provide information about his medical history. In March 2020, Mr. Arena received a full physical exam,

including an electrocardiogram (or "ECG"), a chest x-ray, an eye examination, and a dental examination. At that time, BOP medical personnel observed that Mr. Arena's heart presented with a normal cardiac silhouette and only a slightly tortuous thoracic aorta "without radiographic evidence for an acute cardiopulmonary process." They diagnosed Mr. Arena with an alcohol-induced disorder (indeed, he self-surrendered at the facility with a significantly elevated blood alcohol content), an unspecified cerebrovascular disease, epilepsy, and hypertension. More recently, Mr. Arena received an ultrasound examination of his liver, which was described as "mildly enlarged and heterogeneous," but with no hepatic lesions or growths.

Mr. Arena is 48 years old, an age at which he faces a slightly elevated risk of hospitalization or death from COVID-19. *See* Weekly Updates by Select Demographic and Geographic Characteristics, CENTER FOR DISEASE CONTROL, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed August 3, 2020). But with respect to Mr. Arena's proffered medical issues, the Centers for Disease Control and Prevention has recently revised its analysis of comorbidities to specify that heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension — none of which Mr. Arena has — are considered factors that result in an "increased risk for severe illness from COVID-19," while hypertension, prior strokes, and liver disease are listed as factors that only "may" or "might" result in an "increased risk for severe illness from COVID-19." *See* CENTERS FOR

DISEASE CONTROL AND PREVENTION, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (accessed August 3, 2020).  Epilepsy is not considered a risk factor for COVID-19.

The Court has reviewed with care Mr. Arena's medical records, and concludes that there is nothing to suggest that he is not receiving proper medical care at FPC Lewisburg.  More to the point, Mr. Arena has not suggested that his medical care has been delayed or hampered by the pandemic, and the Court's review discloses that Mr. Arena has received proactive, beneficial care during his incarceration.

Although the Court is concerned by Mr. Arena's discussion of the conditions at FPC Lewisburg (*see* Dkt. #26 at 3), it has also considered the BOP's Pandemic Influenza Plan, *see* https://www.bop.gov/coronavirus/ (accessed August 3, 2020).  The Court is concerned about a recent spike in cases, with 35 inmates in the facility testing positive for the COVID-19 virus.  However, the Court concludes on balance that the danger that Mr. Arena faces from infection with COVID-19, even accounting for his medical conditions, does not amount to an extraordinary and compelling reason for granting compassionate release.  *Cf. United States* v. *Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the

federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Separately, the factors set forth in 18 U.S.C. § 3553(a) counsel against granting Mr. Arena's motion. Those factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(C). Over a period of five years, Mr. Arena abused the trust that had been placed in him by his clients; separate and apart from defrauding them of hundreds of thousands of dollars, he caused financial and emotional stresses — some of which remain — to innocent people who were simply trying to comply with their income tax obligations.

The Court varied downward when it sentenced Mr. Arena for this egregious breach of trust; it intended then, and intends now, for him to serve the totality of that sentence, and not a mere five months of it. Thus, the Court finds that the § 3553(a) factors weigh against granting Mr. Arena's motion.[2]

---

[2] To the extent not already pursued, Mr. Arena may pursue relief in the form of a furlough under 18 U.S.C. § 3622 or home confinement as contemplated in the CARES Act, Pub. L. No. 116-136 (2020), and the Attorney General's April 3, 2020 memorandum to the BOP. The decision to grant that relief, however, is reserved to the discretion of the BOP.

10

## CONCLUSION

For the foregoing reasons, Defendant Mr. Arena's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED. The Clerk of Court is directed to terminate the motion at docket entry 26.

SO ORDERED.

Dated:   August 3, 2020
         New York, New York

                                          KATHERINE POLK FAILLA
                                          United States District Judge

*Sent by First Class Mail to:*
Salvatore Arena,
Reg. No. #86726-054
Federal Prison Camp
P.O. Box 2000
Lewisburg, PA 17837